UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| INTELLICHECK MOBILISA, INC., | CASE NO. C15-0366JLR |
| Plaintiff, | CLAIM CONSTRUCTION ORDER |
| v. | |
| WIZZ SYSTEMS, LLC, | |
| Defendant. | |

## I.   INTRODUCTION

This matter comes before the court on the parties' dispute regarding the construction of certain patent claim terms.  The court has reviewed the parties' claim construction briefs (Pltf. Op. Br. (Dkt. # 38); Def. Op. Br. (Dkt. # 39); Pltf. Resp. (Dkt. # 41); Def. Resp. (Dkt. # 42)), all materials filed in support thereof, the balance of the record, and the relevant law, and has heard oral argument at a February 4, 2016, claim construction hearing (Dkt. # 49).  (*See also* Pltf. Letter Br. (Dkt. # 55); Def. Letter Br.

1  (Dkt. # 59).)  Being fully advised, the court construes the disputed terms as set forth

2  below.

3  ## II.   BACKGROUND

4      This is a patent infringement case involving apparatuses, systems, and methods for

5  verifying the authenticity of identification documents such as driver licenses ("the

6  Invention").  (*See* 2d Am. Compl. (Dkt. # 45) ¶¶ 1, 3; Pltf. Op. Br. at 5; Def. Op. Br. at

7  7.)  Plaintiff Intellicheck Mobilisa, Inc. ("Intellicheck") is the owner by assignment of

8  five patents—four of which are continuation patents—describing the Invention:  United

9  States Patent No. 5,864,623 ("the '623 Patent"), United States Patent No. 6,463,416 ("the

10  '416 Patent"), United States Patent No. 6,920,437 ("the '437 Patent"), United States

11  Patent No. 7,478,067 ("the '067 Patent"), and United States Patent No. 7,899,751 ("the

12  '751 Patent") (collectively, "the Patents-in-Suit").[1]  (2d Am. Compl. ¶¶ 11, 24, 37, 50,

13  63; Def. Op. Br. at 7 n.1.)  Intellicheck asserts that Defendant Wizz Systems, LLC, d/b/a

14  IDScan.net ("IDScan"), has infringed its patent rights both directly and indirectly.  (*See*

15  2d Am. Compl.)

16      The parties dispute the meaning of the following nine claim terms in the Patents-

17  in-Suit:

18      1.  human recognizable;

19      2.  jurisdiction key;

20  _____

21  [1] The Patents-in-Suit share a common specification.  For clarity and convenience, this
22  order generally cites to the disclosure of '623 Patent, which differs from the disclosure in the
    other Patents-in-Suit only in line numbers.

3.  Issuer Identification Number;

4.  a checksum corresponding to selected human recognizable ones of said jurisdiction segments AND[2] a corresponding reference checksum from said machine coded information;

5.  means for reading the information of said document into said programmable apparatus;

6.  means for determining whether said document includes a license format corresponding to a reference license format;

7.  A programmable apparatus for authenticating a document AND authenticating, authentication, authenticate;

8.  first circuitry at said first location for receiving the information read from the driver license and determining whether the read information read [sic][3] comports with said predetermined format;

9.  a jurisdiction discriminator engine adapted to determine and authenticate a jurisdiction.

(Joint Statement (Dkt. # 37) at 3-12.)  The parties' disputed terms are now before the court.

//

//

//

//

---

[2] The court uses conjunctions in all caps to indicate where the parties have submitted multiple distinct phrases or words as a single term requiring construction.  The conjunctions in all caps are not part of the claim terms at issue; they merely separate the phrases or words that the parties have submitted for construction.

[3] In quoting a passage from the Patents-in-Suit that appears to contain a typographical error, the court will use "[sic]" the first time it quotes the passage but not in any subsequent quotations to the same passage.

### III.    DISCUSSION

**A.    Law of Claim Construction**

1. <u>Generally</u>

The court has the sole responsibility for construing patent claims.  *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996).  Subsequent authority has clarified that the court construes claims as a matter of law, though the court may make subsidiary factual findings regarding extrinsic evidence.  *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, --- U.S. ---, 135 S. Ct. 831, 836-38, 840-42 (2015).[4]  In practice, executing the *Markman* mandate means following rules that rank the importance of various sources of evidence of the "true" meaning of claim terms.

The Federal Circuit reiterated its view of the claim construction rules in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc).  Although the case focused on the role of dictionaries in claim construction, it also reviewed the claim construction process. Intrinsic evidence, which includes the patent and its prosecution history, is the primary source from which to derive a claim's meaning.  *Id.* at 1314.  The court's task is to determine the "ordinary and customary meaning" of the terms of a claim in the eyes of a

---

[4] "As all parties agree, when the district court reviews only evidence intrinsic to the patent . . . the judge's determination will amount solely to a determination of law . . . .  In some cases, however, the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period. . . . In cases where those subsidiary facts are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence. . . . [T]his subsidiary factfinding must be reviewed for clear error on appeal. . . . The district judge, after deciding the factual dispute, will then interpret the patent claim in light of the facts as he has found them.  This ultimate interpretation is a legal conclusion." *Teva Pharm. USA, Inc.*, 135 S. Ct. at 841.

person of ordinary skill in the art on the filing date of the patent. *Id.* at 1313 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). In its review of intrinsic evidence, the court should begin with the language of both the asserted claim and other claims in the patent. *Id.* at 1314; *see also Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004) ("[C]laim construction analysis must begin and remain centered on the claim language itself.").

The court must read claim language, however, in light of the remainder of the patent's specification. *Phillips*, 415 F.3d at 1316 ("[T]he specification necessarily informs the proper construction of the claims."). The specification acts as a "concordance" for claim terms, and is thus the best source beyond claim language for understanding claim terms. *Id.* at 1315. The inventor is free to use the specification to define claim terms as she wishes, and the court must defer to the inventor's definitions. *Id.* at 1316 ("[T]he inventor's lexicography governs."). The court should "rely heavily" on the specification in interpreting claim terms. *Id.* at 1317. The court should not, however, commit the "cardinal sin" of claim construction—impermissibly reading limitations from the specification into the claims. *Id.* at 1320 (citing *SciMed Life Sys. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1340 (Fed. Cir. 2001)). Although a court should limit the meaning of a claim where the "specification makes clear at various points that the claimed invention is narrower than the claim language might imply," the court must not read particular embodiments and examples appearing in the specification into the claims unless the specification requires it. *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1370 (Fed. Cir. 2003); *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d

1560, 1571 (Fed. Cir. 1988).  Additionally, while drawings illustrating the invention may

be used in construing claims, "the mere fact that the patent drawings depict a particular

embodiment of the patent does not operate to limit the claims to that specific

configuration." *Prima Tek II, L.L.C. v. Polypap, S.A.R.L.*, 318 F.3d 1143, 1148 (Fed. Cir.

2003).

More recently, the Federal Circuit has continued to stress its emphasis on the

importance of reading the claims in the context of the specification and prosecution

history. *Laryngeal Mask Co. Ltd. v. Ambu*, 618 F.3d 1367, 1370 (Fed. Cir. 2010) ("The

words of a claim are generally given their ordinary and customary meaning as understood

by a person of ordinary skill in the art in question at the time of the invention when read

in the context of the specification and prosecution history.")  Although the patent's

prosecution history is also intrinsic evidence, it is "less useful for claim construction

purposes" than the specification.  *Phillips*, 415 F.3d at 1317.  As the prosecution history

documents an invention's evolution from application to the issuance of the patent, it

usually "lacks the clarity of the specification . . . ." *Id.*  The prosecution history is useful,

however, in determining when an inventor has expressly disavowed certain

interpretations of her claim language.  *Id.*  Specifically, a patentee may limit the meaning

of a claim term by making a clear and unmistakable disavowal of scope during

prosecution.  *Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1374-75

(Fed. Cir. 2008).  A patentee could do so, for example, by clearly characterizing the

invention in a way to try to overcome rejections based on prior art.  *Id.*  The doctrine of

prosecution disclaimer "protects the public's reliance on definitive statements made

during prosecution" by "precluding patentees from recapturing through claim interpretation specific meanings [clearly and unmistakably] disclaimed during prosecution." *Id.* (citations omitted).

Finally, the court can consider extrinsic evidence, "including expert and inventor testimony, dictionaries, and learned treatises." *Phillips*, 415 F.3d at 1317 (citing *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995)). For a variety of reasons, extrinsic evidence is usually "less reliable than the patent and its prosecution history" as a source for claim interpretation. *Id.* at 1318. The court thus need not admit extrinsic evidence, but may do so in its discretion. *Id.* at 1319.

2. Means-Plus-Function limitations

Some of the disputed terms are—or are claimed to be by IDScan—means-plus-function ("MPF") limitations recognized by 35 U.S.C. § 112, ¶ 6. *See infra* Parts III.B.5-9; 35 U.S.C. § 112(f) ("An element . . . may be expressed as a means or step for performing a specified function without the recital of structure . . . in support thereof, and such claim shall be construed to cover the corresponding structure . . . described in the specification and equivalents thereof."). "Claim construction of a means-plus-function limitation includes two steps. First, the court must determine the claimed function. Second, the court must identify the corresponding structure in the written description of the patent that performs that function." *Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324, 1332 (Fed. Cir. 2006) (citing *JVW Enters. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1330 (Fed. Cir. 2005)).

**B.    Construction of Disputed Terms**

1.  <u>human recognizable</u>

This term appears in claims 1 and 15 of the '623 Patent and claim 1 of the '416 Patent.  ('623 Patent (Dkt. # 16-1) at 15:14-17, 15:34-40, 16:48-53, 16:1-6; '416 Patent (Dkt. # 16-2) at 15:14-18.)  Claim 1 of the '623 Patent provides a representative example of the term's use:  "A programmable apparatus for authenticating a document which embodies information comprising both **human recognizable** information and machine recognizable coded information . . . ."  ('623 Patent at 15:14-17 (emphasis added).)  The parties dispute whether this term requires construction at all.

IDScan proposes that the court construe this term as "alphanumeric characters or images visually perceptible and understandable to humans without machine assistance."  (Def. Op. Br. at 19.)  According to IDScan, the specification makes clear that "human recognizable" means alphanumeric characters and images because the specification gives alphanumeric characters and images as examples of human recognizable information.  (*See id.* at 17-19.)  Further, IDScan argues that "[i]t cannot be disputed that" alphanumeric characters and images "are distinguished from their machine recognizable counterparts by virtue of being visually perceptible and understandable to humans without machine assistance."  (*Id.* at 19.)

Intellicheck asserts that no construction is necessary because the meaning of this term is evident on its face—"recognizable by a human."  (Pltf. Op. Br. at 16.)  According to Intellicheck, the extrinsic evidence contains no definition of this term; rather, the specification merely contrasts this term with "machine recognizable" and "machine

1  readable" information  (*Id.* (citing '623 Patent at 2:51-52, 3:1-2, 3:22-24, 14:45-47).)

2  Intellicheck argues that the extrinsic evidence provides no support for the limitations that

3  IDScan seeks to import into this term—that is, only alphanumeric characters or images,

4  only visually perceptible information, only understandable information, and only

5  information that a human can recognize without machine assistance.  (*See* Pltf. Resp. at

6  12-15.)

7      The court DECLINES TO CONSTRUE this term.  IDScan's proposal would

8  require the court to read limitations from the written description and dependent claims

9  into this term and the claims in which it is found.  Thus, IDScan suggests that the court

10  should limit "human recognizable" to alphanumeric characters and images because the

11  written description and other dependent claims makes clear that "human recognizable"

12  includes such things.  (*See* Def. Op. Br. at 18-19.)  Although a court should limit the

13  meaning of a claim where the "specification makes clear at various points that the

14  claimed invention is narrower than the claim language might imply," the court must not

15  read particular embodiments and examples appearing in the specification into the claims

16  unless the specification requires it.  *Alloc, Inc.*, 342 F.3d at 1370; *Constant*, 848 F.2d at

17  1571.

18      The examples that IDScan identifies are just that—examples of human

19  recognizable information; they do not make clear that the Patents-in-Suit limit or define

20  this term as IDScan suggests.  (*See* Def. Op. Br. at 18-19); *see also Karlin Tech., Inc. v.*

21  *Surgical Dynamics, Inc.*, 177 F.3d 968, 971-72 (Fed. Cir. 1999) (noting that the doctrine

22  of claim differentiation, which is based on the notion that different words or phrases used

1  in separate claims are presumed to indicate the claims have different scope, "normally

2  means that limitations stated in dependent claims are not to be read into the independent

3  claims from which they depend").  Furthermore, intrinsic evidence indicates that "human

4  recognizable" encompasses information outside IDScan's proposed limitations.  (*See*

5  '623 Patent at 4:64-5:1 ("The human recognizable information . . . also preferably

6  contains a digital signal representation that is routed to the digital-to-analog (D/A)

7  converter **46**, which converts the digital representation into an analog signal

8  representative of an audio signal." (emphasis in original)).)

9       The court finds no indication in the record that the Patents-in-Suit use this term in

10  anything other than its plain and ordinary meaning in everyday language.  As such, the

11  court declines to construe this term.  *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech.*

12  *Co., Ltd.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008); *U.S. Surgical Corp. v. Ethicon, Inc.*, 103

13  F.3d 1554, 1568 (Fed. Cir. 1997) ("Claim construction is a matter of resolution of

14  disputed meanings and technical scope . . . .  It is not an obligatory exercise in

15  redundancy.").

16       2.  jurisdiction keys

17       This term appears in claims 11 and 16 of the '623 Patent.  ('623 Patent at 16:27-

18  32, 17:8-18:3.)  Claim 11 reads, "The apparatus of claim 1, wherein said means for

19  determining is further operable to determine a jurisdiction identification from a code on

20  said document, wherein **jurisdiction keys** pertaining to said reference license format and

21  said reference jurisdictional segments are enabled to be retrieved."  (*Id.* at 16:27-32

22  (emphasis added).)  Claim 16 reads, "The method of claim 15, wherein said step of

1    determining further includes determining a jurisdiction identification from a code on said

2    document, wherein **jurisdiction keys** pertaining to said reference license format and said

3    reference jurisdictional segments are enabled to be retrieved." (*Id.* at 17:8-18:3

4    (emphasis added).)  The parties agree that a jurisdiction key is information that identifies

5    where jurisdiction segments are stored on storage media; however, the parties disagree

6    about whether such storage locations must be "tracks." (*See* Joint Statement at 8.)

7        IDScan proposes that the court construe this term as "information that identifies

8    the tracks on one or more storage mediums where jurisdiction segments are stored."

9    (Def. Op. Br. at 21.)  According to IDScan, the patentee coined this term, as it has no

10   identifiable definition in a dictionary or other extrinsic evidence.  (*Id.* at 20.)  IDScan

11   argues that the written description defines this term to mean information that identifies

12   tracks where jurisdiction segments are stored—"Program segment **224** loads the

13   jurisdiction 'keys' which identifies [sic] a record for the jurisdictional segment.  More

14   particularly, the 'keys' identify the tracks on the storage mediums **20**, **22**, **24** where

15   jurisdiction segments are stored . . . ." (*Id.* (quoting '623 Patent at 9:18-22) (emphasis

16   original).)

17       Intellicheck proposes that the court construe this term as "information identifying

18   locations on one or more storage media where jurisdiction segments are stored."  (Pltf.

19   Op. Br. at 16-17.)  According to Intellicheck, IDScan improperly attempts to import a

20   limitation from the written description into the claims.  (*Id.* at 17-18.)  Intellicheck

21   maintains that the written description discloses that jurisdiction segments can be stored

22   on tracks (such as on floppy discs or hard drives); however, the description also instructs

1    that the Invention can use other types of storage (including volatile storage, such as

2    random access memory ("RAM"), which does not use tracks) and refers broadly to a

3    "record" as the location of the jurisdiction segments.  (*See id.* at 17 (citing '623 Patent at

4    4:4-14, 9:18-22).)

5         The court agrees with Intellicheck and CONSTRUES this term as "information

6    identifying locations on one or more storage media where jurisdiction segments are

7    stored."

8         Neither party has indicated to the court that "jurisdiction keys" (or even "keys")

9    has a meaning to those of ordinary skill in the art.  The patentee's use of quotations

10   around "keys" in column nine of the specification also indicates that the patentee is

11   coining a new term or at least using an established term in a new sense.  (*See* '623 Patent

12   at 9:18-22.)  Where a disputed term has "no previous meaning to those of ordinary skill

13   in the prior art[,] its meaning, then, must be found [elsewhere] in the patent." *Irdeto*

14   *Access, Inc. v. Echostar Satellite Corp.*, 383 F.3d 1295, 1300 (Fed. Cir. 2004) (quoting

15   *J.T. Eaton & Co. v. Atl. Paste & Glue Co.*, 106 F.3d 1563, 1570 (Fed. Cir. 1997))

16   (alterations in original).  Outside of claims 11 and 16 of the '623 Patent "jurisdiction

17   keys" appears only once in the specification.  At column nine, the patentee explains,

18   "Program segment **224** loads the jurisdiction 'keys' which identifies [sic] a record for the

19   jurisdictional segment.  More particularly, the 'keys' identify the tracks on the storage

20   mediums **20**, **22**, **24** where jurisdiction segments are stored . . . ." ('623 Patent at 9:18-22

21   (emphasis in original).)  This passage indicates that jurisdiction keys are information that

22   identifies a location on one or more storage media where jurisdiction segments are stored.

1    IDScan contends that the text in column nine also shows that the patentee

2  expressly limited jurisdiction keys to information that identifies a track on one or more

3  storage media.  (*See* Def. Op. Br. at 20.)  The court rejects this argument.  The patentee

4  initially states that jurisdiction keys identify a generic "record."  ('623 Patent at 9:18-20.)

5  Although the patentee goes on to explain that "[m]ore particularly, the 'keys' identify

6  tracks on storage mediums **20**, **22**, **24**," that language does not necessarily limit

7  jurisdiction keys to identifying tracks.  (*Id.* at 9:20-22 (emphasis in original).)  The

8  "[m]ore particularly" sentence can be read as a specific illustration of the sentence before

9  it, not as a limitation on storage locations.  (*Id.* at 9:18-22.)  The court finds that reading

10  more sensible and accurate than IDScan's proposal.

11    Moreover, the "[m]ore particularly" sentence is illogical when read in light of the

12  remainder of the specification unless "tracks" is not a limit on storage locations.  (*Id.*)

13  Jurisdiction keys "identify tracks on storage mediums **20**, **22**, **24**."  (*Id.* at 9:20-22

14  (emphasis in original).)  Figure 1 shows that storage medium 24 is volatile storage.  (*Id.*

15  at Fig. 1, elt. 24; *see also id.* at 4:4-14.)  Volatile storage includes RAM, which,

16  Intellicheck asserts, does not use tracks.  (*See* Pltf. Op. Br. at 17 (citing Hellerstein Decl.

17  (Dkt. # 38-1) ¶ 3, Ex. B (excerpts from *Microsoft Computer Dictionary* (3d ed. 1997)

18  (hereinafter "*Microsoft Dictionary*")) at 473 (defining "track" as "[o]ne of numerous

19  circular data storage areas on a floppy disk or a hard drive . . . .  Tracks, composed of

20  sectors, are recorded on a disk by an operating system during a disk format operation."),

21  502 (defining "volatile memory" as "[m]emory, such as RAM, that loses its data when

22

the power is shut off")).)  IDScan does not rebut this assertion.[5]  (*See* Def. Resp.

(omitting any discussion of "jurisdiction keys").)  For these reasons, the court concludes

that jurisdiction keys are not limited to identifying "tracks" on storage media.

    3.  Issuer Identification Number

    This term appears in claims 1, 12, 22, and 32 of the '751 Patent.  ('751 Patent

(Dkt. # 16-5) at 15:14-16, 15:58-62, 16:42-56, 17:19-25.)  Claim 1 reads, in pertinent

part:  "A method in a computing system that uses the contents of an identification

document . . . the method comprising: . . . identifying, by the computing system, an issuer

of the identification document based on an **Issuer Identification Number** that is

contained in the read contents."  ('751 Patent at 15:6-9, 15:14-16 (emphasis added).)

Claim 12 reads, in pertinent part:  "A non-transitory computer-readable storage medium

encoded with instructions that, when executed by a computer system, cause the

computing system to: . . . identify an issuing jurisdiction of the identification document

based on . . . an **Issuer Identification Number** . . . ."  (*Id.* at 15:51-53, 15:58-62

(emphasis added).)  The term's use in claims 22 and 32 is consistent with its use in claims

1 and 12.  (*See id.* at 16:42-56, 17:19-25.)  This term does not appear anywhere in the

written description.  The parties dispute whether this term is limited to American

Association of Motor Vehicle Administrators ("AAMVA") codes.  (*See* Def. Op. Br. at

26.)

---

    [5] At the claim construction hearing, counsel for IDScan admitted that he was not in a position to dispute that RAM or other volatile storage does not include tracks.  (*See* Dkt. # 49.)

1     IDScan proposes that the court construe this term as "an identification number in

2  the range of 636000 to 636062 assigned by AAMVA to an issuing jurisdiction." (*Id.* at

3  28.)  According to IDScan, to convince the Patent Office that the written description

4  addresses this term, the applicant noted that the description incorporates by reference

5  AAMVA standards that define the meaning of this term as "an identification number in

6  the range of 636000 to 636062 assigned by AAMVA to an issuing jurisdiction." (*Id.* at

7  26-28.)

8     Intellicheck proposes that the court construe this term as "an identifier that

9  designates the issuing jurisdiction." (Pltf. Op. Br. at 25.)  Although the written

10  description does not mention this term, Intellicheck argues that the written description

11  discloses that certain identifiers can designate jurisdictions. (*Id.* at 25.)  For instance,

12  Intellicheck points out, the specification discloses that "[p]rogram segment **396** retrieves

13  the jurisdiction identification (ID) and the code of the driver license **78**, which is a code

14  indicating the AAMVA assigned Jurisdiction Number . . . ." ('623 Patent at 13:36-38

15  (emphasis in original).)  Intellicheck notes that during prosecution the applicant cited this

16  passage in the specification as support for "Issuer Identification Number," thereby

17  demonstrating that an AAMVA Jurisdiction Number is one example of an Issuer

18  Identification Number. (Pltf. Op. Br. at 25 (citing Hellerstein Decl. ¶ 6, Ex. E ("'751

19  Patent File Hist.") at 10-11).)  Yet, according to Intellicheck, the applicant did not limit

20  Issuer Identification Number to this one example; rather the applicant also disclosed a

21  generic jurisdiction identifier. (*Id.* (citing '623 Patent at Table 2 elt. 112, Table 4 elt.

22  222, 9:9-18).)

1    Intellicheck contends that the doctrine of claim differentiation also precludes

2  IDScan's proposal.  In particular, Intellicheck observes that several of the '751 Patent's

3  dependent claims recite that the "format is an [AAMVA] format."  ('751 Patent at 15:45-

4  47 (claim 9); Pltf. Resp. at 23; *see also* '751 Patent at 16:38-41 (claim 21), 16:63-65

5  (claim 25), 18:20-23 (claim 38).)  Intellicheck argues that the relevant independent

6  claims, which contain the term at issue here, are presumptively broader and therefore not

7  limited to AAMVA numbers.  (Pltf. Resp. at 23.)  Finally, Intellicheck asserts that

8  extrinsic evidence indicates that this term is not limited to AAMVA numbers.  This term,

9  Intellicheck maintains, is a generic term used for "all manner of documents," as indicated

10  by "the international standard 'ISO/IEC 7812 Identification Cards,'" which notes the use

11  of an issuer identification number for identification cards used in international exchange.

12  (Pltf. Op. Br. at 26 (citing Hellerstein Decl. ¶ 7, Ex. F ("ISO/IEC 7812-1") at 1).)

13    The court CONSTRUES this term as "a number that designates the issuing

14  jurisdiction."

15    IDScan draws an erroneous conclusion from the prosecution history.  During

16  prosecution the applicant cited an AAMVA document as support for the term Issuer

17  Identification Number.  Specifically, the applicant pointed to where the specification

18  explains that "[p]rogram segment **396** retrieves the jurisdiction identification (ID) . . .

19  which is a code indicating the AAMVA assigned Jurisdiction Number."  ('623 Patent at

20  13:38-38 (emphasis in original); *see* '751 Patent File Hist. at 10-11.)  The applicant then

21  linked Jurisdiction Number to Issuer Identification Number by citing to the AAMVA

22  document, which (1) is incorporated by reference in the specification and (2) describes

ORDER- 16

1  Issuer Identification Number as a number that identifies an issuing jurisdiction.  (*See* '751

2  Patent File Hist. at 10-11; '623 Patent at 6:25-31; Yohannan Decl. (Dkt. # 40) ¶ 11, Ex.

3  10 ("AAMVA Recommendations").)

4      IDScan's argument falters because it rests on the premise that the AAMVA

5  document defines the term Issuer Identification Number as being limited to a particular

6  series of numbers.  (*See* Def. Op. Br. at 26-27.)  To the contrary, the AAMVA document

7  makes clear that the series in question is the series of Issuer Identification Numbers

8  reserved for AAMVA members, not the entire universe of Issuer Identification Numbers.

9  (*See* AAMVA Recommendations at 14 ("An application to ANSI [the American National

10  Standards Institute] requesting the issuance of a sequential block of sixty-three (63)

11  Issuer Identification Number (IIN) for the membership of AAMVA was submitted on

12  August 11, 1992.  On November 17, 1992, AAMVA received a reply from ISO [the

13  International Organization for Standardization] approving the request.").)  Thus, in

14  referencing the AAMVA document, the applicant provided a link between the

15  specification and the term "Issuer Identification Number" but did not limit that term as

16  used in the claims to a particular series of numbers.[6]

17      Furthermore, the remainder of the intrinsic evidence does not support the

18  conclusion—implicit in IDScan's position—that the applicant limited the Invention's

19  scope to reading and authenticating documents from AAMVA jurisdictions.  For

20  _____

21  [6] Nor does the reference in the specification to "Jurisdiction Numbers assigned by
    AAMVA" limit this term to AAMVA's particular series of IINs.  ('623 Patent at 13:36-38.)  The

22  court concludes that language is merely a description of the preferred embodiment, not a
    limitation on the claim.  *See Alloc, Inc.*, 342 F.3d at 1370.

1   example, for each of the independent claims using "Issuer Identification Number," the

2   '751 Patent contains dependent claims that reference AAMVA standards.  (*See* '751

3   Patent at 15:45-47 (claim 9), 16:38-41 (claim 21), 16:63-65 (claim 25).)  Thus, claims 9,

4   21, and 25 cover the method, storage medium, or device of independent claims 1, 12, and

5   22, respectively, where the referenced format is an AAMVA format.  (*Id.*)  Claims 10,

6   30, and 39 cover the method, memory or device of those independent claims where the

7   issuing jurisdiction is a state of the United States or a province of Canada.[7]  (*Id.* at 15:48-

8   49, 17:14-15, 18:23-25.)  Applying the doctrine of claim differentiation, the court

9   presumes that the relevant independent claims do not contain these limitations and thus

10  refer to iterations of the Invention that are capable of reading and authenticating

11  documents issued in non-AAMVA formats and by jurisdictions outside the United States

12  and Canada.  *See Karlin Tech., Inc.*, 177 F.3d at 971-72.

13         Nevertheless, the court rejects Intellicheck's attempt to define Issuer Identification

14  Number as a generic "identifier" rather than a number.  (*See* Pltf. Op. Br. at 25.)  Neither

15  the intrinsic nor extrinsic evidence contains any support for that position, and the term

16  itself along with the ISO and AAMVA documents in the record indicate that an Issuer

17  Identification Number is a number.  (*See* ISO/IEC 7812-1 at 1; AAMVA

18  //

19  //

20

21         [7] Subdivisions of the United States and Canada make up AAMVA's member
    jurisdictions.  *See* AAMVA Regions & Jurisdiction Map, http://www.aamva.org/aamva-regions-
22  and-jurisdictions-map/ (last visited March 11, 2016).

1   Recommendations at 14.)  At the claim construction hearing, counsel for Intellicheck

2   conceded this point.  (*See* Dkt. # 49.)[8]

3        4.  checksum

4        The term "checksum" appears in claims 1 and 15 of the '623 Patent and claim 12

5   of the '416 Patent.  ('623 Patent at 15:33-39, 17:1-6; '416 Patent at 17:12-14.)  Although

6   Intellicheck frames the dispute as concerning several longer phrases involving checksum

7   (*see* Pltf. Op. Br. at 13-15), IDScan addresses itself only to the word "checksum" (*see*

8   Def. Op. Br. at 17; Def. Resp. at 11), and Intellicheck's response confines itself to that

9   word (*see* Pltf. Resp. at 11-12).  The remainder of the phrases that Intellicheck discusses

10  appears not to be disputed; therefore, the court construes only the term "checksum."  A

11  representative example of this term's use comes from claim 1 of the '623 Patent:

12      A programmable apparatus for authenticating a document which embodies
        information comprising both human recognizable information and machine
13      recognizable coded information, said apparatus comprising:

14          Means for reading the information of said document into said
            programmable apparatus;

15          …

16
            Means for parsing said read information into jurisdictional segments
17          . . . wherein reference jurisdictional segments as included in said
            reference license format each have predetermined values;

18
            …
19

20

        _____

21      [8] In fact, at the claim construction hearing, counsel for IDScan indicated that as long as
        the court construes this term as a number, IDScan no longer disputes the remaining aspects of
22      Intellicheck's proposed construction.  (*See* Dkt. # 49.)

> Said means further directing the operation of said programmable apparatus for determining whether a **checksum** corresponding to said human recognizable ones of said jurisdictional segments matches a corresponding reference **checksum** from said machine coded information and generating at least a verification signal if said information . . . match[es] . . . .

('623 Patent at 15:14-39 (emphasis added).)

IDScan proposes that the court construe this term as "a digit representing the sum of the correct digits in a piece of stored or transmitted digital data, against which later comparisons can be made to correct errors in the data." (Def. Op. Br. at 17.)  IDScan argues that "checksum" is a well-settled term in the computer arts; thus, IDScan's dictionary definition of this term is the appropriate construction.  (*Id.* (citing online versions of an Oxford Dictionary and the MacMillan Dictionary, an open-source online dictionary).)  According to IDScan, this definition also conforms to the meaning of the word parts "check" and "sum" in the context of the computer arts.  (*Id.*)

Intellicheck proposes that the court construe this term as "data for detecting tampering or alteration of information."  (Pltf. Op. Br. at 14.)  Intellicheck contends that the written description shows that a checksum is an error-checking mechanism that "helps to 'determine[] if the data has been tampered with or altered after having been officially issued.'"  (*Id.* at 14 (quoting '623 Patent at 11:35-37) (alterations in original).)  According to Intellicheck, the specification does not suggest that this mechanism is confined to a particular type of mathematical operation.  (*Id.*)  Rather, the specification "recites the term to mean a general error check," which is consistent with dictionary definitions contemporaneous with the '623 Patent.  (*Id.* (citing *Microsoft Dictionary* 88-

89 (definition of checksum)).)  Intellicheck argues that IDScan's proposal is overly

specific in that it is limited to a digit using a particular type of mathematical

operation—addition.  (*Id.* at 15; *see also* Pltf. Resp. at 11-12.)  Further, Intellicheck faults

IDScan for relying on a dictionary definition from 2015, well after the filing date of the

'623 Patent.  (Pltf. Op. Br. at 15; Pltf. Resp. at 12.)

The court CONSTRUES this term as "a value that is used to test for tampering or

alteration of information and is calculated by sequentially combining the constituent parts

of a chunk of data with a series of arithmetic or logical operations."

Outside of Table 5, the term "checksum" appears in only one portion of the

written description.  That portion reads in total:

> Program segment **304** loads the stored jurisdiction checksum and and [sic]
> passes control over to program loop **306** having a first program segment,
> that is, program segment **308**.  The checksum determines if the data has
> been tampered with or altered after having been officially issued.

> Program segment **308** performs the parity checksum on the track data
> received from program segment **304** and then passes control onto program
> segment **310** via signal path **338**.

('623 Patent at 11:33-41 (emphasis in original).)  This passage explains what a checksum

does—it determines if data has been tampered with or altered—and that explanation

comports with the relevant claim language.  (*See id.* at 15:14-39.)  Yet neither this

passage nor the relevant claim language offers any clue about what a checksum is.

Intellicheck suggests that the court should interpret the absence of further

explanation in the specification as an indication that the patentee used checksum to refer

generically to any mechanism for error checking.  (*See* Pltf. Op. Br. at 14 ("[The

1  specification] recites the term to mean a general error check.").)  Intellicheck then faults

2  IDScan's proposal for lacking support in the intrinsic evidence.  (*See id.* at 15.)

3  Intellicheck neglects to address, however, whether this term has a more specific meaning

4  to those of ordinary skill in the relevant art.  Moreover, Intellicheck's citation to the

5  *Microsoft Dictionary* indicates that this term is a specialized term that does have meaning

6  to those of ordinary skill in the relevant art.

7        The 1997 edition of the *Microsoft Computer Dictionary*, cited by Intellicheck,

8  defines checksum as follows:

9        A calculated value that is used to test data for the presence of errors that can
         occur when data is transmitted or when it is written to a disk.  The
10       checksum is calculated for a given chunk of data by sequentially combining
         all the bytes of data with a series of arithmetic or logical operations.  After
11       the data is transmitted or stored, a new checksum is calculated in the same
         way suing the (possibly faulty) transmitted or stored data.  If the two
12       checksums do not match, an error has occurred, and the data should be
         transmitted again.

13
14  (*Microsoft Dictionary* 88-89.)  The specification shows that in the Patents-in-Suit a

15  checksum functions in a slightly different manner than as described in the *Microsoft*

16  *Dictionary* definition.  Specifically, in the Patents-in-Suit a checksum is used to detect

17  tampering with or alteration of information in a document, not errors in transmitting data

18  or writing data to a disk.  (*See* '623 Patent at 11:33-41.)  Nevertheless, nothing in the

19  specification suggests that patentee intended for checksum to refer to any and all

20  mechanisms that can perform this function, rather than—in accordance with the ordinary

21  meaning of checksum—a "value . . . calculated for a given chunk of data" by combining

22  constituent parts of the data "with a series of arithmetic or logical operations."

1   (*Microsoft Dictionary* 88-89); *see Phillips*, 415 F.3d at 1316 ("[T]he specification may

2   reveal a special definition given to a claim term by the patentee that differs from the

3   meaning it would otherwise possess.").

4          On the other hand, the court finds insufficient support for IDScan's proposal that a

5   checksum is limited to "a digit representing the sum of the correct digits in a piece of

6   stored or transmitted digital data."  (Def. Op. Br. at 17.)  IDScan pulls this definition

7   from non-technical online dictionaries accessed almost twenty years after the initial

8   application for the '623 Patent.  (*See id.*)  As such, IDScan's definition is not persuasive

9   evidence of the meaning of checksum to a person of ordinary skill in the art at the time of

10  the patent application.  *See Phillips*, 415 F.3d at 1313; *Brookhill-Wilk 1, LLC v. Intuitive

11  Surgical, Inc.*, 334 F.3d 1294, 1299 (Fed. Cir. 2003) (refusing to consider dictionary

12  definitions that were "not contemporaneous with the patent").  Furthermore, IDScan's

13  proposal is inconsistent with the intrinsic evidence.  IDScan's proposal covers only

14  checksums composed of "correct digits," whereas the claim 1 contemplates that one

15  checksum may be composed of some incorrect data.  (*See* '623 Patent at 15:14-39

16  (describing a means for "determining whether a checksum corresponding to said human

17  recognizable ones of said jurisdictional segments matches a corresponding reference

18  checksum from said machine coded information and generating at least a verification

19  signal if said information . . . match[es].").)

20         In view of the specification and the contemporaneous definition from the

21  *Microsoft Dictionary*, the court concludes that to a person of ordinary skill in the art at

22  the time of the '623 Patent application, the term checksum means "a value that is used to

test for tampering or alteration of information and is calculated by sequentially combining the constituent parts of a chunk of data with a series of arithmetic or logical operations."[9]

5. <u>means for reading the information of said document into said programmable apparatus</u>

This term is found in claim 1 of the '623 Patent and claim 1 of the '416 Patent. ('623 Patent at 15:14-19; '416 Patent at 15:14-20.)  The relevant portion of the '623 Patent reads:  "A programmable apparatus for authenticating a document which embodies information comprising both human recognizable information and machine recognizable coded information, said apparatus comprising:  **means for reading the information of said document into said programmable apparatus** . . . ."  ('623 Patent at 15:14-19 (emphasis added).)  The relevant portion of the '416 Patent reads:  "A programmable apparatus for authenticating a document which embodies identification information for an identified entity comprising both human recognizable information and machine recognizable coded information, said apparatus comprising:  **means for reading the information of said document into said programmable apparatus** . . . ."  ('416 Patent at 15:14-20 (emphasis added).)  The parties agree that this is a means-plus-function term governed by 35 U.S.C. § 112, ¶ 6.  (*See* Joint Statement at 8.)  However, the parties disagree about whether this term requires reading both human recognizable and machine recognizable information into the apparatus.  (*See* Pltf. Op. Br. at 18; Def. Op. Br. at 21.)

---

[9] At the claim construction hearing, IDScan's counsel indicated that IDScan does not have any objection to this construction of "checksum."  (*See* Dkt. # 49.)

1    IDScan proposes that the court construe this term as "a digital scanner or its

2    equivalent, and one or both of a magnetic reader and a bar code scanner, or their

3    equivalent, for reading both human recognizable information and machine recognizable

4    coded information into an apparatus." (Def. Op. Br. at 23.)  IDScan points out that in this

5    term the patentee uses the definite article "the" before "information," yet the only

6    possible antecedent basis for "the information" is the phrase in the preamble "information

7    comprising both human recognizable information and machine recognizable coded

8    information." (*See id.* at 22-23.)  According to IDScan, such language shows that this

9    term requires reading both human and machine recognizable information into the

10   apparatus.  (*See id.*)

11   Intellicheck proposes that the court construe this claim as having the function

12   "reading information from the document into the apparatus" and the structure "a digital

13   scanner or equivalent, a magnetic reader or equivalent, or a barcode scanner or

14   equivalent." (Pltf. Op. Br. at 18.)  According to Intellicheck, five factors show the error

15   in IDScan's proposal that this term requires reading both human recognizable and

16   machine recognizable information into the apparatus:  IDScan's proposal (1) excludes a

17   preferred embodiment from the scope of the claims; (2) contradicts other uses of "the

18   information" in the specification; (3) makes multiple dependent claims superfluous; (4)

19   makes other dependent claims unworkable; and (5) is inconsistent with the examiner's

20   understanding of the term.  (Pltf. Resp. at 17-20; *see also* Pltf. Op. Br. at 18-22.)

21   The court agrees with IDScan and CONSTRUES this term as a means-plus-

22   function limitation in which the function is "reading both human recognizable

1   information and machine recognizable coded information from the document into the

2   apparatus" and the structure is "a digital scanner or its equivalent, and one or both of a

3   magnetic reader and a bar code scanner, or their equivalent."

4         "When limitations in the body of the claim rely upon and derive antecedent basis

5   from the preamble, then the preamble may act as a necessary component of the claimed

6   invention."  *Eaton Corp. v. Rockwell Int'l Corp.*, 323 F.3d 1332, 1339 (Fed. Cir. 2003);

7   *see also C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1350 (Fed. Cir. 1998) ("[A]

8   preamble usually does not limit the scope of the claim unless the preamble provides

9   antecedents for ensuing claim terms and limits the claim accordingly.").  Further, it is

10   "well established that the definite article 'the' particularizes the subject which it precedes.

11   It is a word of limitation as opposed to the indefinite or generalizing force of 'a' or 'an.'"

12   *NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282, 1306 (Fed. Cir. 2005) (quoting

13   *Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1356 (Fed. Cir. 2003)).  The phrase

14   "the information" in this term finds its antecedent basis in the preamble:  "A

15   programmable apparatus for authenticating a document which embodies *information*

16   comprising both human recognizable information and machine recognizable coded

17   information . . . ."  ('623 Patent at 15:14-17 (emphasis added).)  Without referring to the

18   preamble, the reader would have no idea to what the definite phrase "the information"

19   refers.  The preamble shows that this phrase refers to "information comprising both

20   human recognizable information and machine recognizable coded information" that is

21   embodied in the document to be authenticated.  (*Id.* at 15:14-19.)

22

1     Intellicheck dismisses this reference back to the preamble, arguing that the

2  patentee used "said," not "the," to designate the antecedent basis of terms.  (*See* Pltf. Op.

3  Br. at 20 n.4.)  Thus, Intellicheck maintains that "the information in said document" is a

4  standalone sub-term that refers back to "document" in the preamble, whereas "the

5  information" alone has no antecedent in the relevant claims.  (*See id.*)  The court finds

6  this argument unpersuasive.  Moreover, even if Intellicheck is correct and "said

7  document," not "the information," is a reference back to the preamble, the "document" in

8  the preamble is a document "which embodies information comprising both human

9  recognizable information and machine recognizable coded information."  ('623 Patent at

10  15:14-17.)

11     In addition, examination of the latter part of claims 1 and 15 in '623 Patent

12  confirms that the claimed inventions must read both human recognizable information and

13  machine coded information.  Both of these claims encompass a means for "determining

14  whether a checksum corresponding to selected human recognizable ones of said

15  jurisdictional segments matches a corresponding reference checksum from said machine

16  coded information."  ('623 Patent at 15:33-39, 17:1-6.)  This claim language refers back

17  to "human recognizable information and machine coded information" in the preamble

18  and requires that both types of information have already been read into the apparatus so

19  checksums derived from both types of information can be compared.  (*See id.*; *see also

20  id.* at 15:14-17, 16:48-52.)

21     Intellicheck makes five arguments why the court should reject this interpretation.

22  First, Intellicheck argues that this interpretation excludes a preferred embodiment.  (*See*

1    Pltf. Op. Br. at 18-19 (citing *Vitronics Corp.*, 90 F.3d at 1583-84 (rejecting a construction

2    where "a preferred (and indeed only) embodiment would not fall within the scope of the

3    patent claim").)   Intellicheck finds the preferred embodiment in question in the following

4    language in the written description:   "The information given in Table 2 is read into the

5    CPU **12** via signal paths **82** or **86**."   ('623 Patent at 6:18-19 (emphasis in original).)

6    Table 2 lists the information on the document (in this case a driver license), signal path

7    82 runs from the digital scanner (which reads human recognizable information) and

8    signal path 86 runs from the bar code reader and the magnetic scanner (which read

9    machine recognizable coded information).   (*See id.* at 4:21-34, 5:48-6:16, Fig. 1.)

10   Intellicheck argues that use of the disjunctive "or" means that the apparatus need not use

11   both types of information.   (*See* Pltf. Op. Br. at 19.)

12         The court rejects this argument.   To begin, Intellicheck's reading of the written

13   description is not the only reasonable one.   The relevant passage could be read to mean

14   that some of the information in the license makes its way to the CPU via the digital

15   scanner while some makes its way to the CPU via the bar code reader or magnetic

16   scanner.   (*See* '623 Patent at 6:18-19.)   The patentee's use of "paths" rather than "path"

17   suggests this interpretation is more appropriate.   (*Id.*)   Further, even if Intellicheck is

18   correct that this passage discloses an embodiment that need not use both types of

19   information, the court cannot alter the plain meaning of this term to include all aspects of

20   each disclosed embodiment.   *Cf. Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371,

21   1374 (Fed. Cir. 2004) ("[C]ourts may not redraft claims, whether to make them operable

22   or to sustain their validity. . . . Where, as here, the canons of claim construction cited by

1  [the plaintiff] are inapposite, and we must construe the claims based on the patentee's

2  version of the claim as he himself drafted it." (internal quotation marks omitted)).

3        Intellicheck next argues that the written description defines the sub-term "the

4  information in said document" to mean either or both human recognizable and machine

5  recognizable information.  (*See* Pltf. Op. Br. at 19-20.)  Intellicheck points out that "the

6  digital scanner **30**, the magnetic reader **32**, and the barcode scanner **34** are each capable

7  of reading the information on the identification card."  ('623 Patent at 4:21-23 (emphasis

8  in original); *see* Pltf. Op. Br. at 19-20.)  Intellicheck ends the quotation there, omitting

9  that these devices "are each capable of reading the information on the identification card .

10  . . that is routed to these reading devices."  ('623 Patent at 4:21-24.)  The court reads this

11  passage as a whole to mean that each device is capable of reading the information routed

12  to it.  (*See id.*)  So read, this passage reveals nothing about whether more than one of

13  these devices must be used to practice the described embodiment.  It certainly does not

14  show that the patentee defined "the information in said document" to mean "either human

15  recognizable information or machine recognizable information or both."

16        At the claim construction hearing and in its letter brief, Intellicheck advanced

17  another version of this argument—that "the information" refers only to information that

18  is stored on the identification document in both human recognizable and machine

19  recognizable formats.  (*See* Dkt. # 49; Pltf. Letter Br. at 1.)  In making this alternate

20  argument, Intellicheck relies on the same selective quotation from column four of the

21  specification that the court discussed above.  (*See* Pltf. Letter Br. at 1 (citing '623 Patent

22

1    at 4:21-23).)  That passage provides no more support for this alternate argument than it

2    does for the argument Intellicheck made in its initial briefing.

3           For its third argument, Intellicheck turns to the doctrine of claim differentiation.

4    (*See* Pltf. Op. Br. at 20-21.)  Intellicheck argues that claim 22 of the '416 Patent is

5    superfluous under IDScan's proposed construction.  (*See id.* at 20.)  Claim 22 recites

6    selecting two devices from a list of four to perform the "reading" function of this term.

7    ('416 Patent at 18:1-4.)  Intellicheck argues that this claim cannot be narrower than claim

8    1 if, as under IDScan's proposal, claim 1 already requires two devices in order to read

9    both types of information.  (*See* Pltf. Op. Br. at 20.)  Intellicheck's argument fails,

10   however, because IDScan's proposal requires two or three devices while claim 22

11   requires only two.  *See Kraft Foods, Inc. v. Int'l Trading Co.*, 203 F.3d 1362, 1368 (Fed.

12   Cir. 2000) ("[T]hat the claims are presumed to differ in scope does not mean that every

13   limitation must be distinguished from its counterpart in another claim, but only that at

14   least one limitation must differ.").[10]  Intellicheck also invokes the doctrine of claim

15   differentiation with respect to claim 14 of the '416 Patent.  (*See* Pltf. Op. Br. at 20-21.)

16   That argument fails because claim 14 depends on claim 4, not on claim 1, and claim 4

17   does not contain the term at issue here.  (*See* '416 Patent at 15:58-16:13, 17:19-22.)

18   _____

19          [10] At the claim construction hearing and in its letter brief, Intellicheck also pointed out
     that IDScan's construction would render impossible some combinations that claim 22 allows.
     (*See* Dkt. # 49; Pltf. Letter Br. at 1-2.)  For example, claim 22 would permit the reading means to

20   be a magnetic reader and a bar code.  (See '416 Patent at 18:1-4.)  IDScan's construction
     prohibits that combination because that combination does not allow for reading human
     recognizable information.  (*See* Pltf. Letter Br. at 2.)  This argument fails to persuade the court

21   that Intellicheck's construction is correct.  Any inconsistency involving claim 22 of the '416
     Patent cannot overcome the clear language of the term at issue here and the claims in which that

22   term is found.  *See Chef Am., Inc.*, 358 F.3d at 1374.

1    Intellicheck's fourth argument relies on claim 2, in the '623 Patent.  (*See* Pltf. Op.

2   Br. at 21.)  That claim recites:  "The programmable apparatus according to claim **1**,

3   wherein said information of said document is encrypted."  ('623 Patent at 5:42-43

4   (emphasis in original).)  Intellicheck argues that human recognizable information is not

5   encrypted and therefore under IDScan's proposal claim 2 is unworkable.  (*See* Pltf. Op.

6   Br. at 21.)  The court rejects this argument for two reasons.  First, Intellicheck provides

7   no support for its assertion that human recognizable information cannot be encrypted.

8   (*See id.*)  Second, as discussed above, not requiring the reading of human recognizable

9   information in claim 1 makes claim 1 itself unworkable because claim 1 contemplates a

10   checksum derived from the human recognizable information.

11    Finally, Intellicheck cites to the prosecution history of the '623 Patent and argues

12   that the patent examiner understood this term not to require reading both human

13   recognizable information and machine recognizable information.  (*See* Hellerstein Decl.

14   ¶ 5, Ex. D ("'623 Patent File Hist.") at 2.)  The cited portion of the prosecution history is

15   a document in which the examiner rejects this term as disclosed by three prior art

16   references.  (*See id.*)  Intellicheck argues that these prior art references disclosed reading

17   only machine recognizable information and therefore the examiner must have understood

18   this term as encompassing only a single magnetic reader.  (*See* Pltf. Op. Br. at 21.)  The

19   court has reviewed the cited portion of the prosecution history and finds that it is not

20   sufficiently clear or probative to overcome the intrinsic evidence discussed above.  The

21   exact manner in which the examiner found that the three prior art references disclosed

22   this term is not clear, and therefore the examiner's opinion on the meaning of this term is

1  not clear.  (*See* '623 Patent File Hist. at 2.)  Further, even if the court adopts

2  Intellicheck's interpretation of the examiner's reasoning, the fact remains that the Patent

3  Office issued the '623 Patent with this term still in it.  Intellicheck does not provide

4  enough of the prosecution history for the court to determine what the examiner ultimately

5  concluded about the meaning of this term.[11]

6          The parties do not dispute any other aspects of this term.  Accordingly, the court

7  construes this term as proposed by IDScan.

8          6.  <u>means for determining whether said document includes a license format</u>
              <u>corresponding to a reference license format</u>

9          This term appears in claims 1 and 15 of the '623 Patent and claim 1 of the '416

10  Patent ('623 Patent at 15:20-23, 16:56-59; '416 Patent at 15:21-24.)  A representative

11  example of its use comes from claim 1 of the '623 Patent:  "A programmable apparatus

12  for authenticating a document . . . said apparatus comprising: . . . **means for determining**

13  **whether said document includes a license format corresponding to a reference**

14  **license format** based on a comparison between said read information and said reference

15  license format . . . ."  ('623 Patent at 15:14-23 (emphasis added).)  The parties agree that

16  this is a 35 U.S.C. § 112, ¶ 6 means-plus-function term and that the function is

17  "determining whether the document includes a license format corresponding to a

18  reference license format based on a comparison between the read information and the

19

20  _____

21      [11] For instance, the examiner might ultimately have concluded that the three prior art
    references did not disclose this term because this term requires multiple reading devices in order
22  to read both human recognizable and machine recognizable information.

1   reference license format."[12]  (Joint Statement at 5; Pltf. Op. Br. at 11.)  However, they

2   disagree about what structure corresponds to that function.

3       IDScan proposes that the court construe the structure of this term as "a computer

4   whose actions are directed by the algorithm specified in Table 4 of the '623 and '416

5   Patents, or equivalent structure."  (Def. Op. Br. at 14.)  According to IDScan, the

6   specification makes clear that program subroutine 148—which is depicted in Figure 4A,

7   laid out in Table 4, and described in columns eight through ten of the written

8   description—provides the structure for accomplishing the function of this term.  (*See id.*

9   at 11-13; '623 Patent at Fig. 4A, Table 4, 8:64-10:18.)  IDScan argues that under *WMS*

10  *Gaming, Inc. v. International Game Technology*, 184 F.3d 1339 (Fed. Cir. 1999), the

11  algorithm disclosed in Figure 4A and Table 4 is therefore the structure corresponding to

12  the function for this term.  (*See* Def. Op. Br. at 13-14.)

13      Intellicheck proposes that the court construe the structure of this term as "a

14  processor that executes program segments 148 and 154 and equivalents, and optionally

15  executes program segments 150 and 152 and equivalents."  (Pltf. Op. Br. at 11.)

16  According to Intellicheck, IDScan's proposal erroneously incorporates structure not

17  needed to perform the claimed function.  (*See id.* at 12-13.)  For instance, the program

18  segments in Table 4 include segments for decrypting data, for displaying and storing

19

20      [12] IDScan's opening brief indicated that IDScan would contest function (*see* Def. Op. Br.
21  at 11-14 (indicating that IDScan's proposed function is "determining whether a document is
    blank and/or invalid")); however, IDScan states in its responsive brief that it no longer disputes
22  Intellicheck's proposed function (Def. Resp. at 5 n.1 ("IDScan.net does not take issue with
    Intellicheck's identification of the claimed function for this claim element.")).

1   error message information, and for using jurisdiction keys.  (*See id.*; Pltf. Resp. at 5.)

2   Intellicheck asserts that none of these actions fall within the function "determining

3   whether the . . . license format correspond[s] to a reference license format."  (Ptlf. Op. Br.

4   at 12-13; Pltf. Resp. at 4-6.)

5        Intellicheck argues that the doctrine of claim differentiation further supports

6   excluding decryption and jurisdiction keys because dependent claims in the '623 Patent

7   (claims 2 and 11) contain these limitations.  (*See* Pltf. Op. Br. at 12; '623 Patent at 15:42-

8   46.)  In addition, the latter portions of the claims in which this term appears recite

9   displaying verification signals; therefore, Intellicheck maintains, error messages should

10   not be a part of the term in question here.  (*See* Pltf. Op. Br. at 13 (citing '623 Patent at

11   15:41, and '416 Patent at 15:42, 15:49).)  Intellicheck also faults IDScan's proposal for

12   leaving out essential structure insofar as Table 2's reference to "tracks" suggests a

13   limitation to data from magnetic stripes, whereas the specification makes clear that the

14   Invention can also function with digital scanner and/or a barcode scanner.  (Pltf. Resp. at

15   6.)  Finally, Intellicheck argues that the specification indicates a computer is not

16   necessary to perform this function; rather, a processor is sufficient.  (*Id.* at 3-4.)

17        The court adopts the parties' agreed construction of function and most aspects of

18   IDScan's proposed construction of structure.  Once the court identifies the function in a

19   means-plus-function limitation, the court must then identify the corresponding structure

20   in the written description.  *See Med. Instrumentation & Diagnostics Corp. v. Elekta AB*,

21   344 F.3d 1205, 1210 (Fed. Cir. 2003).  This structure must be linked to the function

22

1    recited in the claim.  *See B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed.

2    Cir. 1997).

3           As an initial matter, the court notes that the specification supports Intellicheck's

4    assertion that this claim requires only a processor, not a computer.  (*See* Pltf. Resp. at 3-

5    4.)  Although the specification refers to performing the Invention on a computer, the

6    specification repeatedly equates the term "computer" to a "CPU" or central processing

7    unit (*see* '623 Patent at Fig. 1, 3:15-18, 14:66-15:1), and teaches that the Invention can be

8    used with various programmable apparatuses that are not personal computers, such as in

9    police cars, at check points, and in vending machines (*see id.* at 15:5-9).

10          The court agrees with IDScan regarding the remainder of the structure.  "In a

11   means-plus-function claim in which the disclosed structure is a computer, or

12   microprocessor, programmed to carry out an algorithm, the disclosed structure is not the

13   general purpose computer, but rather the special purpose computer programmed to

14   perform the disclosed algorithm."  *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d

15   1339, 1349 (Fed. Cir. 1999).  In other words, "[a] computer-implemented means-plus-

16   function term is limited to the corresponding structure disclosed in the specification and

17   equivalents thereof, and the corresponding structure is the algorithm."  *Harris Corp. v.*

18   *Ericsson, Inc.*, 417 F.3d 1241, 1253 (Fed. Cir. 2005).

19          As IDScan explains in its brief (*see* Def. Op. Br. at 11-13), the only structure in

20   the written description that corresponds to the claimed function is the algorithm labeled

21   as program subroutine 148, which is laid out in Table 4 and depicted in Figure 4A.  (*See*

22   '623 Patent at Fig. 4A, Table 4, 7:35-62, 8:64-10:22.)  This algorithm is also explained in

a more generalized form in as part of Figure 3 and Table 3.  (*See id.* at Fig. 3, Table 3,

7:35-62; *see also id.* at 3:4-9 (explaining that Figure 3 is a "flow diagram of the overall

operation of the programmable apparatus" whereas Figure 4A "illustrates one of the four

primary program subroutines making up the overall operation illustrated" in Figure 3),

7:41-44.)  Intellicheck appears to concede this characterization of the written description

but resists IDScan's proposal on the basis that the algorithm in Table 4 includes some

steps not corresponding to the claimed structure.  (*See* Pltf. Op. Br. at 12 (identifying

program routine 148 as directly relating to the claimed function); *see also* Pltf. Resp. at 4

(citing *Micro Chem., Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1258 (Fed. Cir.

1999)); *Micro Chem.*, 194 F.3d at 1258 ("The statute does not permit limitation of a

means-plus-function claim by adopting a function different from that explicitly recited in

the claim.  Nor does the statute permit incorporation of structure from the written

description beyond that necessary to perform the claimed function.").  On this basis,

Intellicheck attempts to excise some steps of program subroutine 148.

      The court rejects Intellicheck's attempt to pick and choose which parts of

subroutine 148 are within the claimed structure.  The cases most helpful to Intellicheck

are *Harris Corp. v. Ericsson, Inc.*, 417 F.3d 1241 (Fed. Cir. 2005), and *University of

Pittsburgh v. Varian Medical Systems, Inc.*, 561 F. App'x 934 (Fed. Cir. 2014).  In both

these cases, the Federal Circuit confronted a computer-implemented means-plus-function

limitation and construed the corresponding algorithm at a high level of generality.  *See

Harris Corp.*, 417 F.3d at 1254 (omitting some aspects of the disclosed algorithm not

necessary to perform the claimed function); *Univ. of Pittsburgh*, 561 F. App'x at 941

1   (limiting the algorithm to its broadest description and declining to include more detailed

2   iterations).  These cases would seem to require the result that Intellicheck seeks;

3   however, in both cases, the Federal Circuit based its broad construction on indications in

4   the written description that the excluded aspects of the algorithm were optional steps.

5   *See Harris Corp.*, 471 F.3d at 1254 ("Aspects of this algorithm can vary based on

6   implementation, as the specification implies.  For example, the algorithm need not be

7   applied to 'an eight-ary PSK transmission scheme'; this is an 'illustration of the effect of

8   [the] thus-far described decision process as applied' to such a transmission scheme.  The

9   same 'decision process' could be applied to another type of transmission scheme."

10  (alteration in original) (internal citations omitted)); *Univ. of Pittsburgh*, 561 F. App'x at

11  941 (noting that the patent "specifically states" that the additional aspects of the

12  algorithm were "merely *implementations*" and that other implementations were also

13  possible (emphasis in original)).  Here, the court discerns nothing in the written

14  description showing that the steps of program subroutine 148 are variable or merely one

15  of multiple possible implementations.[13]  Program subroutine 148 is the only algorithm

16  _____

17  [13] In attempting to refute this statement, Intellicheck relies on the following passage from
    the specification:  "The CPU **12** under the direction of its computer programs, to be more fully

18  described with reference to FIGS. **3** and **4**, routes the information of the identification card **78**,
    *preferably encrypted* as to be described hereinafter, via signal path **90** to the decrypter routine

19  **40**." ('623 Patent at 4:47-51 (italics added; bolding in original); *see* Pltf. Resp. at 4-5; Dkt. # 49;
    *see also* '623 Patent at 6:18-22.)  Program subroutine 148 includes a decryption step, yet

20  according to Intellicheck, the above passage shows that "encryption (and the corresponding
    decryption) is merely a preferred but not required activity."  (Pltf. Resp. at 4-5; *see* '623 Patent at

21  Fig. 4, Table 4, 9:30-34; *see also* '623 Patent at 7:40-43.)  The court disagrees with Intellicheck's
    interpretation of the specification.  The above-quoted passage refers to encryption of the

22  information on the identification document.  (*See* '623 Patent at 4:47-51.)  Program subroutine
    148, in contrast, appears to refer to decryption of the stored reference information.  (*See id.* at

1    disclosed in the written description for performing the claimed function.  Under *WMS*

2    *Gaming*, program subroutine 148 is therefore the corresponding structure for this term.

3    *See* 184 F.3d at 1349.

4            To resist this result, Intellicheck resorts to the doctrine of claim differentiation.

5    (*See* Pltf. Op. Br. at 12-13; Pltf. Resp. at 5-6; Dkt. # 49.)  That doctrine, however, does

6    not help Intellicheck here.  Although the court may employ the doctrine of claim

7    differentiation in construing a means-plus-function term, that doctrine cannot override the

8    statutory mandate of 35 U.S.C. § 112, ¶ 6.  *See Wenger Mfg., Inc. v. Coating Mach. Sys.,*

9    *Inc.*, 239 F.3d 1225, 1233-34 (Fed. Cir. 2001).  Thus, if the specification discloses only

10   one structure to perform the claimed means, the court cannot disregard aspects of that

11   structure in construing a means-plus-function term merely because those same aspects

12   also appear in dependent claims.  *See Laitram Corp. v. Rexnord, Inc.*, 939 F.3d 1533,

13   1538 (Fed. Cir. 1991) ("A means-plus-function limitation is not made open-ended by the

14   presence of another claim specifically claiming the disclosed structure which underlies

15   the means clause or an equivalent of that structure.").  Accordingly, the court

16   CONSTRUES this term as having the function "determining whether the document

17   includes a license format corresponding to a reference license format based on a

18   comparison between the read information and the reference license format" and the

19   structure "a processor whose actions are directed by the algorithm specified in Table 4 of

20   the '623 and '416 Patents, or equivalent structure."

21

22   9:15-34; *see also id.* at 7:35-43.)  As such, the passage on which Intellicheck relies does not
     show that the encryption implicit in program subroutine 148 is optional.

7.  <u>A programmable apparatus for authenticating a document AND authenticating, authentication, authenticate</u>

The term "A programmable apparatus for authenticating a document" appears as the opening phrase in the preamble of claim 1 of the '623 Patent and claim 1 of the '416 Patent.  ('623 Patent at 15:14-15; '416 Patent at 15:14-15.)  The term "authenticate" (or "authenticating" or "authentication") appears in claims 1 and 15 of the '623 Patent; claims 1, 4, and 24 of the '416 Patent; and claims 18 and 19 of the '067 Patent.  ('623 Patent at 15:14, 16:48; '416 Patent at 15:14, 15:58, 18:9; '067 Patent at 16:9, 16:19.) These instances of the shorter term either overlap with the longer term or use "authenticate" in a manner consistent with its use in the preambles of claim 1 in the '623 and '416 Patents.  The court begins with the shorter term.

a.  *authenticating, authentication, authenticate*

IDScan proposes that the court construe this term as "determining or determination that a document, or its contents, or identification criteria contained therein, or a jurisdiction identification is invalid, fraudulent and/or tampered with using a hierarchical process comprising a license format conformance check and a jurisdictional format conformance check."  (Def. Op. Br. at 16.)  According to IDScan, the specification and prosecution history describe only one possible meaning for "authenticate":  using a hierarchical computer process involving several subroutines to determine whether a document is invalid, fake, or tampered with.  (*Id.* at 14-16.) Considering that intrinsic evidence, IDScan argues, "it is axiomatic that the terms 'authenticate' and 'authenticating'" should be construed as IDScan proposes.  (*Id.* at 16.)

1  IDScan asserts that these terms "could mean almost anything if not construed in light of

2  their use in" the specification and prosecution history.  (*Id.*)

3      Intellicheck proposes that the court construe this term as "verifying,"

4  "verification," or "verify."  (Pltf. Op. Br. at 8.)  Intellicheck argues that the specification

5  makes clear that "authenticate" means verify.  For instance, the summary of the invention

6  explains that the "present invention is directed to an authentication system that verifies

7  the contents of documents, such as driver licenses."  ('623 Patent at 2:46-48; Pltf. Op. Br.

8  at 9.)  Intellicheck contends that the prosecution history confirms this interpretation of

9  "authenticate."  (Pltf. Op. Br. at 9 (citing Hellerstein Decl. ¶ 2, Ex. A ("'623 Patent Pros.

10  Hist.") at 6 (applicant describing the invention as "using a hierarchical verification

11  process").)  According to Intellicheck, IDScan's proposed construction amounts to an

12  attempt to import limitations from the preferred embodiments and from a non-limiting

13  description in the prosecution history.  (*Id.*)

14      The court CONSTRUES "authenticate" (and, with corresponding endings,

15  "authentication" and "authenticating") as "verify the authenticity of."  IDScan relies

16  heavily on the fact that its proposal conforms to the only embodiments disclosed in the

17  specification for authenticating a document.  (*See* Def. Op. Br. at 14-16.)  However,

18  "[t]he number of embodiments disclosed in the specification is not determinative of the

19  meaning of disputed claim terms. . . . [A]n accused infringer cannot overcome the 'heavy

20  presumption' that a claim term takes on its ordinary meaning simply by pointing to the

21  preferred embodiment or structures or steps disclosed in the specification."  *Teleflex, Inc.*

22  *v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1327 (Fed. Cir. 2002).  Instead, "claim terms take

ORDER- 40

1  on their ordinary and accustomed meanings unless the patentee demonstrated an intent to

2  deviate from the ordinary and accustomed meaning of a claim term [a] by redefining the

3  term or [b] by characterizing the invention in the intrinsic record using words or

4  expressions of manifest exclusion or restriction, representing a clear disavowal of claim

5  scope." *Id.* "Absent such clear statements of scope, [the court is] constrained to follow

6  the language of the claims, rather than that of the written description." *Id.* at 1328.

7         IDScan fails to direct the court to either an express redefinition of this term or any

8  words or expression of manifest exclusion or restriction that support IDScan's proposal.

9  *See id.* at 1327-28.  IDScan points out that in the abstract the patentee explained that "[i]t

10  is a primary object of the present invention to provide an authentication system to

11  authenticate driver licenses that are coded with machine readable information conforming

12  to AAMVA standards."  ('416 Patent at 2:24-27; Def. Op. Br. at 14.)  The court fails to

13  see how this broad statement could qualify as a clear statement of scope that support's

14  IDScan's proposed definition.  Further, just a few lines below the above-quoted

15  statement, the patentee describes the invention more broadly as "directed to an

16  authentication system that verifies the contents of documents, such as driver licenses."

17  ('416 Patent at 2:42-44; *see also id.* at 2:45-48 ("The authentication system comprises a

18  programmable apparatus that verifies the contents of the document embodying both

19  human recognizable and machine recognizable coded information.").)

20         The portion of the '623 Patent's prosecution history to which IDScan cites

21  likewise fails to provide any clear statement of scope that supports IDScan's position.

22  IDScan points to correspondence wherein the applicant responds to a rejection of claim 1

ORDER- 41

1   on the basis of anticipation by prior art.  (*See* Def. Resp. at 10 (citing '623 Patent Pros.

2   Hist.[14] at 6).)  This correspondence shows the applicant discussing the invention in a way

3   that conforms in some respects to IDScan's proposal; however, nowhere does the

4   applicant discuss the term authenticate, let alone define it or make any clear statements

5   restricting its scope.  (*See* '623 Patent Pros. Hist. at 6.)  As such, IDScan fails to show

6   that the applicant used "authenticate" in any sense other than its plain and ordinary

7   meaning.  *See Teleflex, Inc.*, 299 F.3d at 1327-28.

8           *Webster's* defines authenticate, in part, as "to establish convincingly as accurate,

9   true, real, or genuine."  *Webster's Third New International Dictionary* 146 (2002); *see*

10  *also id.* (also defining authenticate as "to verify to the origin of").  Further, the

11  specification shows that the Patents-in-Suit use authenticate as a synonym of verify.

12  ('416 Patent at 2:42-48 ("The present invention is directed to an authentication system

13  that verifies the contents of documents, such as driver licenses.  The authentication

14  system comprises a programmable apparatus that verifies the contents of the document

15  embodying both human recognizable and machine recognizable coded information.").)

16  *Webster's* defines verify, in part, as "to confirm the truth or truthfulness of . . . to confirm

17  or establish the authenticity or existence of."  *Webster's Third New International*

18  *Dictionary* 2543.  Nothing in the Patents-in-Suit indicates that authenticate—or verify—

19

20

---

21      [14] IDScan includes in its supporting materials the same portion of the '623 Patent's
22  prosecution history that the court previously cited as Exhibit A to the Hellerstein declaration.
    (*Compare* Yohannan Decl. ¶ 6, Ex. 5 *with* Hellerstein Decl. ¶ 2, Ex. A.)

1   is used other than in this ordinary sense.  As such the court construes this term as "verify

2   the authenticity of."

3            *b.  A programmable apparatus for authenticating a document*

4        IDScan argues that this preamble language is limiting and also a means-plus-

5   function term.  (Def. Op. Br. at 16-15.)  IDScan urges the court to construe it as "a

6   computer whose actions are directed by the algorithms specified in Tables 4 and 5 of the

7   '623 and '416 Patents, or equivalent structure, for determining whether a document or

8   identification criteria contained therein is invalid, fraudulent, and/or tampered with."

9   (Joint Statement at 3.)  According to IDScan, all independent claims in the '623 and '416

10  Patents recite an apparatus for authenticating or a method for authenticating or

11  authentication, and these authentication preamble limitations give meaning to the

12  respective claims as a whole and therefore should be given patentable weight.  (Def. Op.

13  Br. at 16-17.)

14       Intellicheck counters that this preamble language is not limiting and requires no

15  construction.  (Joint Statement at 3.)  Rather, Intellicheck argues, this language is merely

16  a high-level preamble description that identifies the claim elements that follow; it is not a

17  limitation on the claims.  (Pltf. Op. Br. at 10-11.)  According to Intellicheck, IDScan is

18  attempting to incorporate every claim limitation from the body of the claim into one

19  phrase in the preamble.  (*Id.* at 11.)  Intellicheck asserts that this approach is improper

20  and will only serve to confuse the jury.  (*Id.*)

21       The court rejects IDScan's proposal to construe this preamble language as a

22  means-plus-function limitation on the claims.  To begin, IDScan's opening brief contains

ORDER- 43

1  only two sentences on this subject.  (*See* Def. Op. Br. at 16-17.)  The first simply quotes

2  the relevant preambles, and the second then concludes, "Each of these preamble

3  'authentication' limitations gives meaning to the respective claims as a whole, and

4  therefore, should be given patentable weight."  (Def. Op. Br. at 16-17 (citing *Gen. Elec.*

5  *Co. v. Nintendo Co., Ltd.*, 179 F.3d 1350, 1361-62 (Fed. Cir. 1999) and *Karsten Mfg.*

6  *Corp. v. Cleveland Golf Co.*, 242 F.3d 1376, 1380 (Fed. Cir. 2001)).)  This argument is

7  inadequately briefed and thus not properly before the court.  *See United States v. Great*

8  *Am. Ins. Co. of N.Y.*, 738 F.3d 1320, 1328 (Fed. Cir. 2013) ("It is well established that

9  arguments that are not appropriately developed in a party's briefing may be deemed

10  waived." (citing *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed.

11  Cir. 2006))).  Furthermore, the court sees no indication that the preamble language at

12  issue "breathes life and meaning into the claim[s]."[15]  *Gen. Elec. Co.*, 179 F.3d at 1361.

13  Instead, the preamble language merely describes the purpose and intended use of what is

14

15

16  ———————————

[15] At the claim construction hearing, counsel for IDScan argued that once some language in a preamble is limiting, the entire preamble is limiting.  (*See* Dkt. # 49.)  Thus, according to IDScan, if in construing disputed term No. 5 ("means for reading . . .") the court finds part of the preamble of claim 1 of the '623 Patent is limiting, the court must to find that all of that preamble is limiting and adopt IDScan's proposed construction of "programmable apparatus for authenticating a document."  (*See id.*)  The court asked IDScan for authority to support this theory.  (*See id.*)  IDScan was unable to cite any authority at the time but after the hearing provided the court with the following five citations:  *Bell Communications Research, Inc. v. Vitalink Communications Corp.*, 55 F.3d 615, 620-21 (Fed. Cir. 1995); Manual of Patent Examining Procedures § 2111.02; *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999); *Eaton Corp. v. Rockwell International Corp.*, 323 F.3d 1332, 1339 (Fed. Cir. 2003); and *Pacing Technologies, LLC v. Garmin International*, 778 F.3d 1021, 1023 (Fed. Cir. 2015).  The court has reviewed the cited material and is not persuaded that in this context it mandates application of the hard-and-fast rule that IDScan referenced at the claim construction hearing.  Accordingly, the court rejects IDScan's argument.

1  claimed below. *See Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251,

2  1257 (Fed. Cir. 1989). Accordingly, the court DECLINES TO CONSTRUE this term.

3      8. <u>first circuitry at said first location for receiving the information read from the driver license and determining whether the read information read comports with said predetermined format</u>

4

5  This term appears in claim 1 of the '067 Patent. That claim reads in its entirety:

6  Apparatus comprising:

7      an information reader at a first location for reading information from a driver license issued by an issuing jurisdiction, said information having a predetermined format corresponding to said jurisdiction; and

8

9      **first circuitry at said first location for receiving the information read from the driver license and determining whether the read information read comports with said predetermined format**, said first circuitry also outputting the information read to a remote location for further processing, said remote location being connected to said first location via a signal path.

10

11

12  ('067 Patent at 14:63-15:7 (emphasis added).) The parties dispute whether this is a

13  § 112, ¶ 6 means-plus-function limitation and, if so, what the scope of the structure is.

14  (*See* Pltf. Op. Br. at 22-24; Def. Op. Br. at 23-26.)

15      IDScan proposes the court find this term to be means-plus-function term and

16  construe it as "a computer whose actions are directed by the algorithm specified in Table

17  4 of the '067 Patent, or equivalent structure, or a computer whose actions are directed by

18  the algorithm specified in Table 5 of the '067 Patent, or equivalent structure, either of

19  which [is] used for determining whether read information comports with a predetermined

20  format." (Def. Op. Br. at 26.) According to IDScan, this term fails to recite sufficiently

21  definite structure and recites function without reciting structure for performing that

22

1  function.  (*See id.* at 25.)  IDScan characterizes this term as a mere nonce word that acts

2  as a surrogate for the word "means."  (*See id.*)

3      Intellicheck disputes that this term is a means-plus-function term and argues that

4  no construction is needed.  (Pltf. Op. Br. at 22.)  According to Intellicheck, the term does

5  not recite "means for" and therefore there is a rebuttable presumption that it is not a

6  means-plus-function limitation.  (*See id.* at 22-23.)  Intellicheck argues that IDScan has

7  not overcome that presumption.  (*See id.*; Pltf. Resp. at 20-21.)  Further, Intellicheck

8  asserts that this term recites sufficiently definite structure.  (*See* Pltf. Op. Br. at 23-24.)

9      The court rejects IDScan's proposal and DECLINES TO CONSTRUE this term

10  because IDScan has not met its burden to show that this term fails to recite sufficient

11  structure or recites function without reciting sufficient structure for performing that

12  function.  Further, Federal Circuit case law indicates that claim limitations that recite a

13  circuitry along with its function generally have sufficient structure to avoid being means-

14  plus-function limitations.

15      Under Federal Circuit precedent, if a disputed claim term does not employ the

16  word "means," a presumption arises that the term is not a means-plus-function term.

17  *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1348-49 (Fed. Cir. 2015).  The

18  challenger can rebut that presumption by demonstrating that a person of ordinary skill in

19  the art would not understand the term to have sufficiently definite meaning as a name for

20  structure.  *See id.* at 1349.  The challenger must demonstrate that, to a person of ordinary

21  skill in the art, the term fails to recite sufficiently definite structure or else recites function

22  without reciting sufficient structure for performing that function.  *Id.*; *Apex Inc. v.*

1  *Raritan Computer, Inc.*, 325 F.3d 1364, 1373 (Fed. Cir. 2003) ("We next must determine

2  whether Raritan has shown that the limitation, as understood by one of ordinary skill in

3  the art, demonstrates that the claim term fails to recite sufficiently definite structure or

4  else recites a function without reciting sufficient structure for performing that function.").

5  "In the absence of sufficient evidence, the presumption stands." *Apex*, 325 F.3d at 1373.

6      This term does not contain the word "means." ('067 Patent at 14:63-15:7.)  As

7  such, the court presumes that the term is not a means-plus-function limitation. *See*

8  *Williamson*, 792 F.3d at 1348-49.  The burden is therefore on IDScan to show that this

9  term, as understood by one of ordinary skill in the art, fails to recite sufficiently definite

10  structure or else recites a function without reciting sufficient structure for performing that

11  function. *See Apex*, 325 F.3d at 1373.

12      IDScan falls considerably short of meeting its burden.  In its opening brief,

13  IDScan spends approximately two pages discussing this issue.  (*See* Def. Op. Br. at 23-

14  25.)  IDScan devotes almost all of that discussion to reciting case law, particularly the

15  Federal Circuit's *Williamson* decision.  (*See id.*)  At the end of that recitation, IDScan

16  offers only two sentences regarding the "first circuitry term":

17          The term "first circuitry" in claim 1 of the '607 Patent can fair [sic] no
        better than the term "module" in *Williamson*.  In both cases, the employed
18          term is a nonce term that provides absolutely no definition of structure,
        merely acts as a surrogate for the term "means," and depends entirely on
19          the recited function to provide definition of the corresponding structure.

20  (*Id.* at 25.)  These remarks are conclusory and fail to demonstrate that this term does not

21  recite sufficiently definite structure or recites a function without reciting sufficient

22  structure for performing that function.  On this basis alone, the court rejects IDScan's

1    proposal and declines to construe this term as a means-plus function term.  *See Apex*, 325

2    F.3d at 1373; *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, No. 2:14-CV-0911-

3    JRG-RSP, 2015 WL 6956722, at *17 (E.D. Tex. Nov. 9, 2015) ("Though Defendants

4    provide attorney argument that 'circuitry' is a nonce word, Defendants have not pointed

5    to persuasive evidence that the term 'circuitry' does not connote structure to one skilled

6    in the art.").

7         Furthermore, the court notes that the Federal Circuit has on three occasions

8    confronted a "circuit" or "circuitry" term and found that such terms recites sufficient

9    structure.  *See Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1320-21 (Fed.

10   Cir. 2004) ("We hold that because the term 'circuit' is used in each of the disputed

11   limitations of claims 1, 44, 55, and 57 of the '178 patent with a recitation of the

12   respective circuit's operation in sufficient detail to suggest structure to persons of

13   ordinary skill in the art, the 'circuit' and 'circuitry' limitations of such claims are not

14   means-plus-function limitations . . . ."); *Apex*, 325 F.3d at 1373 ("[I]t is clear that the

15   term 'circuit,' by itself connotes some structure.  In the absence of any more compelling

16   evidence of the understanding of one of ordinary skill in the art, the presumption that

17   § 112, ¶ 6 does not apply is determinative."); *Mass. Inst. of Tech. & Elecs. For Imaging,*

18   *Inc. v. Abacus Software*, 462 F.3d 1344, 1355-56 (Fed. Cir. 2006) ("The claim language

19   here too does not merely describe a circuit; it adds further structure by describing the

20   operation of the circuit.  The circuit's input is 'appearance signals' produced by the

21   scanner; its objective is to 'interactively introduce[e] aesthetically desired alterations into

22   said appearance signals'; and its output is 'modified appearance signals.'" (alterations in

original)).  The term here, though less detailed than those in *Linear Technology*, *Apex*, and *Massachusetts Institute*, also recites a circuitry and describes its operation.  (*See* '067 Patent at 14:63-15:7 ("[F]irst circuitry at said first location for receiving the information read from the driver license and determining whether the read information read comports with said predetermined format, said first circuitry also outputting the information read to a remote location for further processing . . . .").)

IDScan argues in its responsive brief that the court should find an absence of sufficient structure because this term contains less detail than the terms at issue in *Linear Technology*.  (*See* Def. Resp. at 16-20.)  IDScan also points out that the plaintiffs in those cases presented evidence such as dictionary definitions and expert testimony that Intellicheck has not presented here.  (*See id.*)  With respect to the differences in detail, the court finds nothing in the case law to suggest that the level of detail here mandates a different result than in *Linear Technology*, *Apex*, and *Massachusetts Institute*.  Nor does the absence of dictionary definition or expert testimony persuade the court to side with IDScan.  The above cited cases contain multiple definitions of circuit that those courts relied on in finding that the circuit terms recited sufficient structure.  *See, e.g.*, *Linear Tech. Corp.*, 379 F.3d at 1320.  Moreover, even disregarding those definitions would not cause the court to alter its decision.  IDScan bears the burden to rebut the presumption against applying § 112, ¶ 6.  *See Apex*, 325 F.3d at 1373.  Because IDScan has presented nothing but unsupported and conclusory argument, Intellicheck need not bolster the presumption with evidence.  *See id.*

Intellicheck asserts that this term needs no construction, and IDScan does not offer any construction other than its proposed § 112, ¶ 6 construction.  The court rejects IDScan's proposal because IDScan has failed to carry its burden to demonstrate that this term fails to recite sufficient structure.  The court therefore declines to construe this term.

9.  a jurisdiction discriminator engine adapted to determine and authenticate a jurisdiction

This term appears in claim 24 of the '416 Patent.  The entirety of that claim reads as follows:

> A programmable apparatus for authenticating an identification document of an individual comprising:
>
> a reader adapted read [sic] information from said identification document;
>
> a processor under the control of software including:
>
> **a jurisdiction discriminator engine adapted to determine and authenticate a jurisdiction** that originated said identification document using said information; and
>
> a comparator adapted to compare segments of said information to a predetermined acceptance criteria and generate a result; and
>
> a reporting device adapted to provide results of said comparator.

('416 Patent at 18:9-23 (emphasis added).)  The parties disagree about whether this is a means-plus-function term, and, if it is such a term, what the proper structure is.  (*See* Pltf. Op. Br. at 26-28; Def. Op. Br. at 28-29.)  In addition, Intellicheck proposes a construction about which IDScan offers no argument or commentary.  (*See* Pltf. Op. Br. at 26-27; Def. Op. Br. at 28-29; Def. Resp. at 21-22.)

—

IDScan proposes that the court find this term to be a means-plus-function term and construe it as "a computer whose actions are directed by the algorithms specified in Tables 4 and 5 of the '416 Patent, or equivalent structure, used to determine whether a document or identification criteria contained therein is all three of invalid, fraudulent or tampered with."  (Def. Op. Br. at 29.)  According to IDScan:

> It is beyond dispute that the phrase "adapted to determine and authenticate a jurisdiction" constitutes functional language.   In order to ascertain whether such functional language should control and mandate treatment of the entire term as a means-plus-function term, the patent specification must be consulted to identify what, if any, jurisdiction discriminator engine structure is disclosed therein.   This exercise is a *fait accompli* since "jurisdiction discriminator engine" does not appear even once in the '416 patent written description.    The utter absence of any disclosure of jurisdiction discriminator engine leaves no room to treat the full term as anything but a means-plus-function term.

(*Id.* at 28-29 (citing *Williamson*, 792 F.3d at 1350, as support for IDScan's implicit theory that the absence of a putative structural term in the specification rebuts the presumption that § 112, ¶ 6 does not apply).)

Intellicheck argues that this term is not a means plus function term and should be construed as "software capable of discriminating between jurisdictions to determine an issuing jurisdiction and verifying contents of the document according to the determined jurisdiction." (Pltf. Op. Br. at 26.)  According to Intellicheck, the specification discloses that the Invention runs on operating programs residing on a CPU that comprise a plurality of program segments.  (*Id.*)  Intellicheck asserts that because those components carry out the particular steps of the Invention, it follows that the "engine" is software running on a processor.  (*Id.* at 26-27.)  Thus, Intellicheck argues, the claim term is directed to

1    software that is capable of discriminating between jurisdictions.  (*Id.* at 27.)

2    Furthermore, Intellicheck contends that the court should construe "adapted to determine

3    . . . a jurisdiction" to mean determining the issuing jurisdiction, and should construe

4    "adapted to . . . authenticate a jurisdiction" consistently with the term "authenticate,"

5    *supra*, to mean verifying the contents of a document according to the determined

6    jurisdiction.  (*Id.*)

7        The court ADOPTS Intellicheck's proposed construction.  Although the

8    specification does not contain the term "jurisdiction discriminator engine," Intellicheck

9    accurately describes how the specification maps onto this term and supports

10    Intellicheck's proposed construction.  (*See id.* at 26-27 (citing '623 Patent at Fig. 4A,

11    6:32, 6:46-48, 9:36-43, 10:66-11:43).)  Moreover, beyond arguing for a means-plus-

12    function construction, IDScan has offered no opposition to Intellicheck's proposed

13    construction.  (*See* Def. Op. Br. at 28-29; Def. Resp. at 21; Dkt. # 49.)

14        The court rejects IDScan's proposal for the same reasons as with the previous

15    term.  This term does not contain the word "means" ('416 Patent at 18:9-23); therefore, a

16    rebuttable presumption arises that this term is not means-plus-function limitation.  *See*

17    *Williamson*, 792 F.3d at 1348-49.  Rather than offering evidence or even case authority to

18    rebut this presumption, IDScan again puts forward only conclusory assertions.  (*See* Def.

19    Op. Br. at 28-29; Def. Resp. at 21.)  IDScan appears to argue that the presumption is

20    automatically rebutted because the putative structure—the "discriminator engine"—does

21    not appear in the specification.  (*See* Def. Op. Br. at 28-29.)  According to IDScan,

22    *Williamson* supports this principle.  (*See id.* (citing *Williamson*, 792 F.3d at 1350).)  The

1  court, however, finds no such principle in *Williamson*.  Moreover, IDScan presents no

2  evidence to explain to the court how a person of ordinary skill in the art would

3  understand this term and why that person would find that this term recites insufficient

4  structure.  (*See id.*; Def. Resp. at 21.)  The court therefore finds that IDScan has failed to

5  meet its burden to rebut the presumption that this is not a means-plus-function term.  *See*

6  *Apex*, 325 F.3d at 1373.

7  ## IV.    CONCLUSION

8  For the foregoing reasons, the court rules as follows:

9  (1) the court DECLINES TO CONSTRUE "human recognizable";

10  (2) the court CONSTRUES "jurisdiction keys" to mean "information identifying

11  locations on one or more storage media where jurisdiction segments are

12  stored";

13  (3) the court CONSTRUES "Issuer Identification Number" to mean "a number

14  that designates the issuing jurisdiction";

15  (4) the court CONSTRUES "checksum" to mean "a value that is used to test for

16  tampering or alteration of information and is calculated by sequentially

17  combining the constituent parts of a chunk of data with a series of arithmetic or

18  logical operations";

19  (5) the court CONSTRUES "means for reading the information of said document

20  into said programmable apparatus" as a means-plus-function limitation

21  wherein the function is "reading both human recognizable information and

22  machine recognizable coded information from the document into the

1    apparatus" and the structure is "a digital scanner or its equivalent, and one or

2    both of a magnetic reader and a bar code scanner, or their equivalent";

3    (6) the court CONSTRUES "means for determining whether said document

4    includes a license format corresponding to a reference license format based on

5    a comparison between said read information and said reference license format"

6    as a means-plus-function limitation wherein the function is "determining

7    whether the document includes a license format corresponding to a reference

8    license format based on a comparison between the read information and the

9    reference license format" and the structure is "a processor whose actions are

10   directed by the algorithm specified in Table 4 of the '623 and '416 Patents, or

11   equivalent structure";

12   (7) the court CONSTRUES "authenticate" to mean "verify the authenticity of" and

13   DECLINES TO CONSTRUE "A programmable apparatus for authenticating a

14   document";

15   (8) the court DECLINES TO CONSTRUE "first circuitry at said first location for

16   receiving the information read from the driver license and determining whether

17   the read information read comports with said predetermined format"; and

18   //

19   //

20   //

21   //

22   //

(9) the court CONSTRUES "a jurisdiction discriminator engine adapted to

determine and authenticate a jurisdiction" to mean "software capable of

discriminating between jurisdictions to determine an issuing jurisdiction and

verifying contents of the document according to the determined jurisdiction."

Dated this 28th day of March, 2016.


JAMES L. ROBART
United States District Judge